Slip Op. 12- 40

UNITED STATES COURT OF INTERNATIONAL TRADE

---

YANGZHOU BESTPAK GIFTS
& CRAFTS CO., LTD.,

                Plaintiff,

                v.

UNITED STATES,

                Defendant,

BERWICK OFFRAY LLC,

                Defendant-Intervenor.

Before: Judith M. Barzilay, Senior Judge

Court No. 10-00295

---

[Commerce's separate rate calculation is sustained.]

Dated: March 22, 2012

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP (*Bruce M. Mitchell, Mark E. Pardo, Ned H. Marshak and Andrew T. Schutz*), for Plaintiff Yangzhou Bestpak Gifts & Crafts Co., Ltd.

*Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Renee Gerber*); and *Scott D. McBride*, U.S. Department of Commerce, Of Counsel, for Defendant United States.

Pepper Hamilton LLP (*Gregory C. Dorris*) for Defendant-Intervenor, Berwick-Offray LLC.

## **OPINION**

      BARZILAY, Senior Judge:  This case returns to the court following a partial remand of

the final results of an antidumping duty investigation conducted by the U.S. Department of

Commerce ("Commerce") covering narrow woven ribbons from the People's Republic of China

and Taiwan. *See Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China*, 75 Fed. Reg. 41,808 (Dep't of Commerce July 19, 2010) ("*Final Results*"), as amended *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 75 Fed. Reg. 51,979 (Dep't of Commerce Aug. 24, 2010) (amended final determination); *see also Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, A-570-952 (July 12, 2010) ("*Decision Memorandum*"), *available at* http://ia.ita.doc.gov/frn/summary/PRC/2010-17568-1.pdf (last visited Mar. 22, 2012). Before the court are the Final Results of the redetermination (Sep. 26, 2011) ("*Remand Results*") filed by Commerce pursuant to *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 35 CIT __, 783 F. Supp. 2d 1343 (2011) ("*Bestpak*"). The court has jurisdiction under Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006), and 28 U.S.C. § 1581(c). For the reasons set forth below, the court sustains Commerce's *Remand Results*.

## I. BACKGROUND

The investigation involved nineteen respondents, which Commerce identified as a large number of companies pursuant to 19 U.S.C. § 1677f-1(c)(2). Commerce selected only two mandatory respondents to determine the weighted average dumping margins for the pool of twelve uninvestigated respondents who qualified for a separate rate. *See* § 1677f-1(c)(2)(B). The first mandatory respondent, Ningbo Jintian Import & Export Co., Ltd. ("Ningbo Jintian"), failed to cooperate in the investigation and was assigned an adverse facts available ("AFA") rate of 247.65%. The second, Yama Ribbons & Bows Co., Ltd. ("Yama"), fully cooperated in the investigation and was assigned a *de minimis* rate of 0%. Plaintiff Yangzhou Bestpak Gifts &

Crafts Co., Ltd.'s ("Bestpak") was not selected as a mandatory respondent but applied for

separate rate status, successfully establishing an absence of *de jure* or *de facto* government

control. To calculate the separate rate, Commerce took the simple average of the rates assigned

to Ningbo Jintian (247.65%) and Yama (0%), yielding a rate of 123.83%, which Commerce

assigned to Bestpak and the other eleven separate rate respondents. *See Final Results*, 75 Fed.

Reg. at 41,811.

      Bestpak then commenced this action challenging Commerce's separate rate calculation.

*See Bestpak*, 783 F. Supp. 2d at 1345. Bestpak claimed that Commerce had violated the

antidumping statute by factoring an AFA rate into the separate rate calculation. *Id.* Plaintiff also

claimed that Commerce's separate rate calculation yielded a rate that did not reasonably reflect

Bestpak's potential dumping margin. *Id*. The court, in turn, concluded that Commerce had not

violated the statute by factoring an AFA rate into the separate rate calculation. *Id*. at 1349-50.

The court, though, had reservations on the substantial evidence issue of the reasonableness of

Commerce's decision-making given the administrative record. *Id.* at 1350-53. The court was

concerned that Commerce's simple average of the two rates may have been too facile and

perhaps did not "reasonably reflect" Bestpak's potential dumping margin. *Id.* The court

remanded the case to Commerce for further explanation as to "how the separate rate of 123.83%

relates to Bestpak's commercial activity." *Id*. at 1353.

      In the *Remand Results* Commerce attempted to comply with the court's remand order by

utilizing the limited information provided in the quantity and value ("Q&V") questionnaires to

calculate estimated average unit values ("AUV") for the two mandatory respondents and

Bestpak. *Id.* at 6-7. The AUV analysis conducted by Commerce relied on individually reported

Q&V data submitted by respondents during the antidumping investigation. *Id.* After comparing

the AUV information to the dumping margins established during the investigation, Commerce

again determined that "the separate rate assigned to [Bestpak] in the Final Determination

reasonably reflects its potential dumping margin." *Id.* at 7.

## II. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. §

1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains

Commerce's "determinations, findings, or conclusions" unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or

conclusions for substantial evidence, the court assesses whether the agency action is reasonable

given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed.

Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United

States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)). Substantial evidence has also been described as "something less than the

weight of the evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## III. DISCUSSION

In non-market economy investigations Commerce assumes that respondent companies

operate under foreign government control. *See Sigma Corp. v. United States*, 117 F.3d 1401,

1405 (Fed. Cir. 1997). During the course of an antidumping investigation, Commerce affords

non-investigated respondents the opportunity to establish an absence of government control and

thereby secure a separate rate. *See Policy Bulletin 05.1: Separate–Rates Practice and*

*Application of Combination Rates in Antidumping Investigations Involving Non–Market*

*Economy Countries*, at 2, 3–4, 6 (Apr. 5, 2005) (explaining separate rate practice and stating

Commerce will calculate a separate rate for the "pool of non-investigated firms" in an NME

proceeding) *available at* http://ia.ita.doc.gov/policy/bull05-1.pdf (last visited Mar. 22, 2012);

*Sigma Corp.*, 117 F.3d at 1405.

  In calculating a separate rate for non-individually investigated respondents in non-market

economy investigations, Commerce normally relies 19 U.S.C. § 1673d(c)(5)(A), which defines

the all-others rate used in market economy investigations. *See Bristol Metals L.P. v. United*

*States*, 34 CIT __, __, 703 F. Supp. 2d 1370, 1378 (2010) (citation omitted). The statute instructs

Commerce to weight-average the rates calculated for the investigated parties, excluding *de*

*minimis* or zero rates and excluding rates based on facts available, to determine the separate rate.

19 U.S.C. § 1673d(c)(5)(A). However, "[i]f the estimated weighted average dumping margins

established for all exporters and producers individually investigated are zero or *de minimis*

margins, or are determined entirely [on the basis of facts available], the administering authority

may use any reasonable method to establish the estimated all-others rate for exporters and

producers not individually investigated, including averaging the estimated weighted average

dumping margins determined for the exporters and producers individually investigated." §

1673d(c)(5)(B). The Statement of Administrative Action provides that the "expected method in

such cases will be to weight-average the zero and *de minimis* margins and margins determined

pursuant to the facts available, provided that volume data is available." *Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Doc. No. 103–316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ("SAA"). It goes on to state that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." *Id.*

Here, Commerce selected two mandatory respondents, Yama and Ningbo Jintian. Only Yama cooperated, receiving a *de minimis* 0% dumping margin. *See Final Results*, 75 Fed. Reg. 41,811. Ningbo Jintian stopped cooperating early, receiving an AFA rate of 247.65%. *See id.*; *see also Memorandum from Zhulieta Willbrand, RE: Ningbo Jintian*, Pub. Admin. R. Doc. No. 109 (Oct. 6, 2009). Bestpak, as an un-investigated respondent, did not submit responses to Commerce's antidumping duty questionnaires. This resulted in an administrative record with limited data points that unfortunately yielded only a *de minimis* and an AFA rate. As a result, Commerce could not calculate a separate rate using individually investigated margins (excluding the *de minimis* and AFA rates) because they did not exist. *See* 19 U.S.C. § 1673d(c)(5)(A).

Instead, Commerce used "other reasonable methods", SAA at 873, and took the simple average of what seem like extreme data points (0% and 247.65%) to calculate a separate rate for all twelve of the respondents that qualified for separate rate status, which included Bestpak. *See Preliminary Results*, 75 Fed. Reg. 7244, 7248-49 (Dep't of Commerce Feb. 18, 2010). This is an approach Commerce has used in the past. *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10,545, 10,546 (Dep't of Commerce Mar. 11, 2009) and accompanying *Issues and Decision*

*Memorandum* at Cmt. 6 (Mar. 5, 2009) ("[F]or purposes of determining the separate rate

margins, because there are no rates other than *de minimis* or those based on AFA, we have

determined to take a simple average of the AFA rate and the de minimis rate . . . .") *available at*

http://ia.ita.doc.gov/frn/summary/PRC/E9-5237-1.pdf (last visited Mar. 22, 2012); *see also*

*Changzou Wujin Fine Chem. Factory Co. v. United States*, Slip Op. 10–85, 2010 WL 3239213,

at *4 (Aug. 5, 2010) ("Likewise, Commerce followed its customary practice when it calculated

the separate rate by averaging the revised AFA rate with the zero rate of the mandatory

respondent.").

  The court originally remanded this case out of concern that Commerce's separate rate

calculation – taking the simple average of Yama's *de minimis* 0% rate and Ningbo Jintian's

247.65% AFA rate – was potentially too simplistic an approach given the administrative record.

The court anticipated that the administrative record might contain enough available information

to expand the menu of potential separate rates beyond the 123.83% as calculated and assigned by

Commerce. After reviewing the *Remand Results*, however, the court must acknowledge that the

administrative record does not contain sufficient sales data to support a more sophisticated

separate rate calculation.

  Bestpak, for its part, requests an order from the court directing Commerce to assign

Bestpak a 0% rate. Pl.'s Comments 20. This request gives the court pause, especially when

measured against the substantial evidence standard of review, which places certain limits on the

court's ability to replace, by affirmative injunction, a separate rate chosen by Commerce

(123.83%) with another of the court's choosing. To do so, the administrative record must support

the alternative 0% rate urged by Bestpak as the one and only correct separate rate, not just for

Bestpak, but for <u>all</u> other separate rate respondents. To achieve that result, Bestpak would need

to explain to the court how the administrative record supports using Yama alone as a proxy for

<u>all</u> separate rate respondents, as opposed to a simple average of Yama and Ningbo Jintian. The

administrative record, however, does not contain much sales data, meaning the court cannot have

much confidence that one particular choice over another is in fact the one, true, correct answer

for the separate rate margin. Additionally, Bestpak, in effect, wants the court to reject the AFA

rate while fully embracing Yama's *de minimis* rate, a position that loses its appeal when read

against the statutory guidance to exclude <u>both</u> facts available and *de minimis* margins (if

possible) when calculating separate rates. *See* 19 U.S.C. § 1673d(c)(5)(A).

 In *Bestpak* the court proceeded under a premise that assumed the administrative record

contained more information about Bestpak's and the other separate rate respondents' potential

dumping margins. In actuality, the administrative record contains very little specific sales

information about Bestpak or the other separate rate respondents. *See, e.g., Quantity and Value

Questionnaire Response for Yangzhou Bestpak Gifts & Crafts Co.. Ltd.*, Pub. Admin. R. Doc.

No. 57 (Aug. 19, 2009) ("*Q&V Response*"); *Separate Rate Application for Yangzhou Bestpak

Gifts & Crafts Co., Ltd.*, Pub. Admin. R. Doc. No. 102 (Oct. 5, 2009) ("*Separate Rate Appl.*").

As a non-investigated respondent, Bestpak was not required to submit extensive sales data to

qualify for a separate rate. *See Preliminary Determination*, 75 Fed. Reg. 7244. During the

investigation Bestpak submitted to Commerce Q&V questionnaire responses (to provide

Commerce with information to select mandatory respondents) and a separate rate application (to

establish *de jure* and *de facto* independence from government control). *See Q&V Response*, Pub.

Admin. R. Doc. No. 57; *Separate Rate Appl.*, Pub. Admin. R. Doc. No. 102; *Preliminary*

*Determination*, 75 Fed. Reg. 7244. Bestpak did not submit any additional information regarding

its pricing practices.

     The *Remand Results* underscore this point. On remand, Commerce did its best to identify

record evidence that would provide some indication of Bestpak's potential dumping margins.

Commerce used respondents' Q&V data (typically used to identify highest volume producers of

the subject merchandise) to establish estimated AUVs, which, according to Commerce,

represented the "only basis the Department has for a comparison between the companies." *Id.* at

16. In attempting to comply with the court's order, Commerce explained that an

> estimated AUV is a ratio calculated by dividing a respondent's total value of sales
> by its total quantity of sales, which provides a rough, estimated snapshot of a
> respondent's pricing practices. A low estimated AUV in comparison to other
> exporters can indicate, all other things being equal, the existence of a larger
> dumping margin, while a high estimated AUV, again, presuming all other factors
> are equal, can indicate the reverse to be true.

*Remand Results* at 6.

     Commerce's AUV analysis appears to be consistent with the dumping margins

established in the *Final Results*. *Id.* at 6 and Attachment I (Estimated Average Unit Value

Calculations). The AUV analysis itself, however, may be of limited utility. Commerce

acknowledged the difficulties of relying on AUV data:

> [T]here is no substitute for dumping margins determined by the Department in the
> context of its investigations and reviews; and AUVs are no substitute for the
> Department's determinations. Importantly, in this instance, there are no price
> adjustments made to AUVs and the Department does not have any information
> that would even indicate whether such sales were export price or constructed
> export price transactions. AUVs also provide no indication of the normal value
> side of the dumping equation. Therefore, we recognize the limited application of
> AUVs in this context.

*Remand Results* at 16. Having a better understanding of the limits of the administrative record,

the court acknowledges that Commerce was doing the best that it could in response to the court's

order. The AUV data merely provide a rough estimate of U.S. sales price and therefore do not

provide much information about Bestpak's potential dumping margins. For example, it would be

difficult for the court to draw meaningful inferences and conclusions about Bestpak's potential

dumping margins from AUV data that does not account for normal value, price adjustments, or

constructed export price transactions. This is a natural consequence of a limited administrative

record. The problem here is not the AUV data or Commerce's attempted analysis of it, the real

problem is the absence of enough sales data.

　　　Apart from Commerce's AUV analysis, the record contains little information as to what

Bestpak's (or the other separate rate respondents') potential dumping margin might be, or

whether it is closer to 0% or 247.65%.[1] Likewise, the court, Commerce, and Bestpak simply

cannot know on this administrative record whether the separate rate "reasonably reflects"

commercial reality. *See* SAA at 873. In an investigation Commerce begins the process of data

collection and margin calculation, relying on the cooperation of mandatory (and voluntary)

respondents. With the benefit of the additional data and calculated margins in subsequent

administrative reviews, Commerce develops an ever-evolving familiarity with industry pricing

practices, which in turn permits Commerce to better evaluate (and the court to review) whether a

---

[1] Bestpak argues, for the first time, that Bestpak should be assigned a 0% rate because of a sales invoice it submitted as part of its application for separate rate status. Pl.'s Comments 20. Bestpak, however, failed to raise this argument before Commerce, depriving Commerce of the opportunity to address it. As such, the court will not entertain it now. *See* 28 U.S.C. § 2637(d); *Carpenter Tech. Corp. v. United States*, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006) (citing *Woodford v. Ngo*, 548 U.S. 81, 88-90 (2006)). Moreover, the court is not persuaded that one sales invoice is sufficient to demonstrate that the separate rate should be 0%.

separate rate "reasonably reflects" commercial reality. At the investigation stage, however, that

ability to identify and measure whether a separate rate "reasonably reflects" commercial reality

can be severely limited. This is the case here. The court initially viewed Commerce's separate

rate calculation as potentially too facile. What the *Remand Results* reveal is that Commerce had

few, if any, reasonable options under the circumstances presented by a limited administrative

record.

      With that said, a separate rate respondent (like Bestpak) is not entirely without options. It

may (1) challenge Commerce's selection of a small a number of respondents from which a

separate rate can be derived; as well as (2) request a voluntary investigation pursuant to 19

U.S.C. § 1677m(a). *See* 19 C.F.R. § 351.204(d). Although Bestpak challenged Commerce's

selection of a small number of mandatory respondents in its administrative case brief, Commerce

rejected the argument because it was too late in the administrative proceeding. *See Decision*

*Memorandum* at Cmt. 10 ("Put simply, given the statutory time constraints of an investigation, it

is not feasible at this time to identify an additional respondent, provide that respondent with time

to respond to our questionnaires, analyze the data and develop a preliminary determination,

provide parties with an opportunity to comment upon the determination, solicit rebuttal

comments, and then develop a final determination. These labor-intensive efforts take several

months to complete and, because Bestpak first suggested that we consider an additional

respondent in its case brief, less than three months remained in statutory time period to complete

the investigation. . . .   Bestpak did not present its suggestion that the Department investigate an

additional respondent at a point in the proceeding where the Department could have acted upon

its request. . . . Bestpak had ample opportunity to raise this issue as early as October 2009, when

Ningbo Jintian missed the deadline to respond to the Department's Sections C and D questionnaire."). Bestpak chose not to challenge this decision in its brief before the court.

Alternatively, Bestpak did not request a voluntary investigation pursuant to 19 U.S.C. § 1677m(a). *See Decision Memorandum* at 21 ("[W]e also note that no interested parties submitted a voluntary response to the Department's full antidumping questionnaire."); *see also Grobest & I-Mei Industrial (Vietnam) Co. v. United States*, Slip Op. 12-9, at 37 (Jan. 18, 2012) ("*Grobest*"). Considering Bestpak's stance that it is entitled to a 0% dumping margin, this option could have supplied the necessary pricing information for Commerce to calculate an individual dumping margin for Bestpak. Rather than pursue its own individual rate, Bestpak instead seeks the full benefit of Yama's 0% individual rate without incurring the same costs, effort, and risk that Yama assumed to obtain it. Even if Commerce rejected Bestpak's request, Commerce would have been required to explain its decision under 19 U.S.C. § 1677m(a), which "plainly requires Commerce to conduct individual reviews unless such reviews would be unduly burdensome and inhibit the timely completion of the investigation." *Grobest*, Slip. Op. 12-9, at 40; *see also Zhejiang Native Produce & Animal By-Prods. Import & Export Corp. v. United States*, 33 CIT __, __, 637 F. Supp. 2d 1260, 1264-65 (2009) (concluding that Commerce's failure to review respondent that preserved its request for individual review when mandatory respondents withdrew was unreasonable).

Commerce's separate rate margin calculated using a simple average of a *de minimis* and facts available margin may be unfortunate and even frustrating, but it is not unreasonable on this limited administrative record. The court issued a remand in the belief there might be additional choices from which Commerce could calculate the separate rate. In this case, however, those

Court No. 10-00295                                                                    Page 13

additional choices apparently do not exist. For the foregoing reasons, Commerce's separate rate

calculation is sustained. The court will enter judgment accordingly.


Dated:  <u>March 22, 2012</u>                                   ____/s/ Judith M. Barzilay_____
        New York, NY                                   Judith M. Barzilay, Senior Judge

Slip Op. 12-40

UNITED STATES COURT OF INTERNATIONAL TRADE

YANGZHOU BESTPAK GIFTS
& CRAFTS CO., LTD.,

    Plaintiff,        Before: Judith M. Barzilay, Senior Judge

    v.           Court No. 10-00295

UNITED STATES,

    Defendant,

BERWICK OFFRAY LLC,

    Defendant-Intervenor.

**JUDGMENT**

   Upon consideration of Commerce's Final Results of Redetermination, Plaintiff's

Comments in Opposition to the Redetermination, and all other papers filed in this action, and

upon due deliberation, it is hereby

   **ORDERED** that Commerce's separate rate calculation is sustained.

Dated: <u>March 22, 2012</u>       <u>/s/ Judith M. Barzilay</u>
   New York, NY         Judith M. Barzilay, Senior Judge